UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 07-80112-CIV-HURLEY

**LAFARGE NORTH AMERICA, INC.,**
    plaintiff,

vs.

**MATRACO COLORADO, INC., and
JOHN WALKER,**
    defendants.
_____/

## MEMORANDUM OPINION AND ORDER
## GRANTING IN PART & DENYING IN PART
## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
## ON DEFENDANTS' COUNTERCLAIMS

    Plaintiff Lafarge North America, Inc. ("Lafarge") sues defendants Matraco-Colorado, Inc., ("Matraco") and John Walker ("Walker") seeking the return of certain mining equipment purchased on its behalf during the exploration of a potential business venture between the parties at Mole St. Nicolas, Haiti. The defendants, joined by claimant Matraco-Colorado Holding Ltd ("Matraco Holding"), counterclaim for breach of an alleged oral joint venture agreement, alternative equitable causes of action, and various business torts.

    The case is now before the court on Lafarge's motion for partial summary judgment on the counterclaims. Lafarge charges that the parties at best had an agreement to agree in the future, which is unenforceable as a matter of law, and, alternatively, that any oral agreement would be void under the statute of frauds as one which could not be performed within one year. Lafarge further argues that defendants' various alternative equitable causes fail as a matter of law because they are based on the same conduct and are merely derivative of an otherwise unenforceable agreement.

    Finally, Lafarge seeks summary disposition of defendants' remaining counterclaims for

breach of an alleged confidentiality agreement, misuse of confidential trade secret information, claim on account stated, and tortious interference with contract.

Upon careful consideration of the parties' respective briefing on these claims, the court finds the existence of genuine issues of material fact which preclude summary judgment on the claims for breach of confidentiality agreement, trade secrets violations and tortious interference with contract. On the main contract claim, however, the court finds no debatable issue on the question of whether the parties intended to be bound by their preliminary discussions on the proposed joint venture. Finding no mutual intent to be bound, the court holds that no enforceable contract was formed and that summary judgment is appropriately entered in favor of plaintiff Lafarge on this claim. Defendants' alternative equitable causes of action fail as well, for reasons more particularly set forth in the discussion which follows.

## I. Fact Background

Plaintiff John F. Walker is a geologist with over ten years of field geology and related experience. In late 2001 and 2001, he began a study of Caribbean geology and the development of a business plan to establish stone quarries in the country of Haiti, focusing specifically on a quarry located in Mole St. Nicolas, Haiti (the "Haiti Project"). Between 2001 and 2004, Walker researched and developed a plan to extract, market, distribute and sell "construction aggregate" [crushed stone, sand and gravel] and other stone from this quarry throughout the Caribbean and southeastern United States. The business plan incorporated Walker's study and analysis of Haiti's geology, demographics, local labor force, geopolitical situation, as well as an environmental impact assessment and research in various mining technologies.

Walker established "Matraco-Colorado Holding Ltd. (Matraco Holding)," a British Virgin Islands corporation, to carry out his business plan in Haiti. Through Matraco Holding, Walker established a partnership with a Haitian entity known as "Matraco S. A, " and then, in the name of Matraco S.A., negotiated and obtained a long term mining lease, quarrying and environmental permits, and port operations permissions needed to extract and export stone from the Mole St. Nicolas Quarry.

In November, 2004, Walker approached Lafarge, N.A. seeking financial, operational and marketing support for his plan. Lafarge N.A. is a Maryland corporation which produces and supplies construction materials, including cement, concrete, and concrete aggregates, throughout the United States and Canada. It is a wholly owned subsidiary of Lafarge S.A., a corporation organized under the laws of France, a world leader in the production and supply of aggregates and concrete.

After initial discussions, Lafarge asked Walker to conduct a preliminary study, the "Phase Zero Study," in order to collect basic information for its assessment of the Haiti Project. On November 15, 2004, Walker and Lafarge entered into a Confidentiality Agreement ("Agreement") under which Lafarge was permitted to use Walker/Matraco's confidential information in order to evaluate the parties' prospective relationship, and, with this Agreement in place, Walker provided Lafarge with the details of his business plan together with all data collected by him during the study, including geological data, financial projections, start up costs, marketing analysis and operational research and plans.

While discussions continued, Lafarge required that Walker establish a United States entity through which to pursue the project. Walker accordingly established Matraco-Colorado Inc., a

3

Florida corporation, to interface with Lafarge on the proposed Haiti venture.

On May 10, 2006, Matraco and Lafarge signed a "Letter of Intent" and incorporated "Confidential Term Sheet" memorializing their initial discussions on the Haiti Project.

This Letter states, in pertinent part:

This letter is intended to set forth a letter of intent between Matraco- Colorado Incorporated, a Florida corporation (MCI) including its affiliate company, Matraco-Colorado Holding Ltd., a British Virgin Islands international business corporation, and Lafarge North America Inc., a Maryland corporation or one of its affiliates or subsidiaries ("Lafarge").

1. Overall Structure. Our goal is to establish a joint venture by forming a new entity, Saint Nicholas Stone (SNS) to be jointly owned by Lafarge and MCI. Our initial belief as to the overall structure and purpose of the venture is set forth in the attached Term Sheet, which would need to be properly documented in definitive agreements.

2. Negotiations. We agree to negotiate to determine if the joint venture will be appropriate for the parties, provided, however, that either party may terminate negotiations without penalty at any time for any reason.

3. Confidentiality of negotiations (...)

4. Entirety. (...)

5. Exclusivity (...)

6. Governing Law (...)

7. Construction This letter shall be construed according to its fair meaning and not strictly for or against either party. **This letter does not, and is not intended to, impose any binding obligations on the parties**, except as provided in Sections 3, 4, 5 and 6 above. (emphasis supplied)

The attached "Term Sheet" identifies the "formation date" as "after execution of the Joint Venture Agreement." It proposed a 20% ownership interest in Saint Nicholas Stone to be held by Matraco, with an 80% interest to be held by Lafarge. It also proposes that Matraco take a 2% net sales management fee, with an 8% fee going to Matraco.

On or about June 2005, Lafarge N.A. Vice President Nat Fischer formally presented the Haiti Project, internally dubbed "Project Columbus," to other Lafarge N.A. executives using the preliminary data gathered and supplied by Walker. As the relationship and negotiations further progressed, Lafarge paid Matraco/Walker an advance management fee of $200,000.00, and also advanced $1.7 million dollars to Matraco for the purchase of mining equipment and other tangible assets needed to develop the Haiti Project.

In June, 2006, Lafarge contracted with a project manger recommended by Walker to assisting in running the day-to-day operations of the Mole St. Nicolas Quarry and on June 23, 2006, it established "Saint Nicolas Stone," the entity through which the parties' contemplated joint venture was intended to operate.

As the summer of 2006 progressed, Walker remained on site to operate the Mole St. Nicolas Quarry, and repeatedly asked Lafarge to forward the written contracts needed to consummate their relationship. Walker avers that Lafarge representative Nat Fisher frequently assured him that written agreements would be forthcoming. However, it is undisputed that --apart from the non-binding letter of intent and incorporated term sheet dated May 10, 2006 – the terms and conditions of the alleged joint venture were never reduced to a writing signed by any of the parties.

By the end of 2006, the parties' relationship had soured, and on December 7, 2006, Lafarge discharged Walker from the Project. Walker claims that the proffered reasons for his termination – fiscal mismanagement and inability to raise debt financing – were purely pretextual and that Lafarge had long earlier devised a scheme to misappropriate the Mole St. Nicolas quarry business opportunity from Walker. Once Lafarge obtained the proprietary and confidential

5

information that it needed to operate the Haiti Project on its own, he claims, Lafarge felt free to discharge him in order to defeat his claimed ownership interest in Saint Nicolas Stone.

After discharging Walker, Lafarge asked Matraco to transfer title to the mining equipment purchased on its behalf and to refund the unearned portion of its management fee, which Lafarge approximated to be $100,000.00. Failing to obtain a satisfactory response, Lafarge filed this lawsuit asserting claims for conversion and unjust enrichment against Walker and Matraco, prompting, in turn, the defendants' counterclaims for breach of the parties' confidentiality agreement, breach of alleged oral joint venture agreement, and the related tort and equitable claims which are the subject of this summary judgment proceeding.

## II. Discussion

### A. Breach of Oral Contract/Joint Venture Agreement Claim

On motion for summary judgment, Lafarge initially urges that the May 10, 2006 Letter of Intent/Confidential Term Sheet and the various oral communications that preceded and followed it amounted, at best, to an "agreement to agree" or preliminary statement of intent to contract in the future, which is unenforceable as a matter of law in Florida. *See e.g. Bergman v DeIulio*, 826 So.2d 500 (Fla. 4th DCA 2002) and cases cited *infra; Spanish Broadcasting System of Fla., Inc. v Alfonso*, 689 So.2d 1092 (Fla. 3d DCA 1997).

It emphasizes that while the basic framework of the parties' proposed business venture was laid out in the May 10, 2006 Letter of Intent, numerous contractual issues remained to be resolved, as recognized in the written expression of the parties themselves, who, at paragraph 2 of the Letter of Intent recited simply that they were "agree[ing] to negotiate to determine if the joint venture will be appropriate," while at the same time recognizing that "either party may terminate negotiations

without penalty at any time for any reason." Lafarge suggests that this evidence plainly demonstrates that the parties did not intend to be bound as of May 10, 2006 by their preliminary discussions, but rather contemplated the continuation of negotiations leading to a mutually acceptable joint venture agreement at some point in the future.

Walker/Matraco, however, contend that the combination of correspondence and oral communications between the parties resulted in the formation of an agreement to pursue the joint venture, and that while a formal, written venture agreement was never executed, there is sufficient evidence from which a jury could infer the existence of such an agreement. In order to enforce such agreement, defendants maintain that the parties need only specify the essential terms of the venture, without necessarily elaborating on the details of every provision. They contend that the Letter of Intent, viewed in conjunction with the attached "Term Sheet," and subsequent course of dealing and communications between the parties clearly articulated the essential terms of their understanding and satisfied the basic specificity requirements for creating a contract.

However, by focusing on the level of specificity required to create a contract, defendants skirt the primary, threshold question concerning whether the parties intended for their preliminary negotiations to create a binding legal obligation: Unless the parties intended to be bound by statements made during these discussions, which they memorialized in their Letter of Intent, they did not enter into a contract to pursue the contemplated business venture – *regardless* of the level of specificity or detail discussed and agreed upon. *Doll v Grand Union Company*, 925 F.2d 1363 (11th Cir. 1991).

As explained by the Eleventh Circuit in *Doll*:

Every possible provision of a contemplated [contract] may be discussed and agreed

>upon, but unless the parties intend that these discussions be binding, no contract has been formed. When the parties express their intention to be bound and they specify the basic terms of the [contract], the courts will enforce the contract... to avoid frustrating the parties' original intent. When such indications of intent are absent or are explicitly disavowed, however, the justification for enforcing the proposed [contract] is wholly absent. The court does not address the terms of the proposed [contract] until it has satisfied itself that the parties did indeed intend to be bound.

*Id*. at 1368-1369.

In this case, the May 10, 2006 Letter of Intent and incorporated "Term Sheet" literally achieves nothing more than an agreement to negotiate and explore the possibility of pursuing the Mole St. Nicolas venture in the future, going so far as to reserve the right to either party to "terminate negotiations without penalty at any time for any reason." Further, the parties specifically expressly disavowed an intent to be bound by any provision of the Letter of Intent ["This letter does not, and is not intended to, impose any binding obligations on the parties..": Letter of Intent, ¶7] and more generally disavowed any intent to be bound short of consummation, execution and delivery of a formal "Definitive Agreement." ["The parties understand and agree that no contract or agreement for a Relationship will be deemed to exist unless and until a definitive agreement regarding a Relationship (a "Definitive Agreement") has been executed and delivered and hereby waive in advance any claims, including breach of contract in connection with the Relationship.": Confidentiality Agreement, ¶6].

This falls far short of an enforceable contract, and the subsequent dealings between the parties -- including the numerous oral communications, commitment of substantial time and financial resources, and Lafarge's frequent reference to Walker/Matraco as its "partner" in Haiti – do not cure this deficiency nor permit an agreement to be inferred from the surrounding

circumstances. [1]

Such an inference is plainly defeated by the parties' clear and unambiguous expression of their intent not to be bound in the absence of a written formal agreement. The letter of intent and attached term sheet make clear that the parties contemplated future negotiations leading to a formal written contract (Letter of Intent, ¶ 1 "Our initial belief as to the overall structure and purpose of the venture is set forth in the attached Term Sheet, *which would need to be properly documented in definitive agreements* (emphasis added); (Term Sheet: "Formation Date: After execution of the Joint Venture Agreement."). This plainly evinces the parties' mutual expectation that a more detailed written agreement would be forthcoming before the deal was final, and make clear that the parties were only entering into confidential discussions about a potential business venture.

There is also evidence in the record suggesting that even Walker/Matraco understood that Lafarge had not committed itself. Mr. Walker, for example, testified that he felt the Letter of Intent/Term Sheet supplied a "framework that the rest of the house would be built on," and acknowledged that additional work would need to be done. While that work was underway and the parties' relationship progressed over the summer of 2006, Walker repeatedly asked Fisher to send the final contract papers for signature. His anxiety in this regard suggests that he knew that without a completed written agreement, he could not be sure that the deal would go through, and that his

---

[1] Walker/Matraco summarize these circumstances to include a reference to the Haiti Project as a "joint venture (80/20) with Matraco Colorado to form Saint Nicholas Stone" within an internal Lafarge "Preliminary Clearance Form" dated May 15, 2006; the payment of the $200,000 advance management fee to Walker in May 2006; the formation of St. Nicholas Stone on June 23, 2006; Lafarge's repeated reference to Walker/Matraco as its "partner" in subsequent internal memos generated on July 23, July 27, August 9, August 11, Sept. 21, and October 16, 2006; a statement in an email from Fisher to Walker on July 23, 2006 "You are a director of SNS and need to start acting like one."

commitment to the project would be exposed to considerable risk.

Nat Fisher, speaking on behalf of Lafarge, for his part similarly understood that the Letter of Intent simply supplied an "initial framework to understand as to how the parties could assess and begin to develop the potential opportunity."

On this predicate, there is no basis for the court to step in and infer the existence of a binding agreement, and the alleged oral agreement fails as a matter of law for lack of insufficient indicia of an intent to be bound. *See Doll v Grand Union Co., supra; Lynkus Communications Inc. vs WebMD Corporation*, 965 So.2d 1161 (Fla. 2d DCA 2007). Consequently, the court shall enter summary judgment in favor of Lafarge on the defendants' breach of oral contract-joint venture agreement claim (Count 2). [2]

## B. Contract Contingent Claims

Without a joint venture agreement, there was no joint venture partnership, and without a partnership, there was no fiduciary duty owed by Lafarge to Walker/Matraco. Although a fiduciary relationship may be implied at law, in this case there are no allegations of dependency and protection alleged in the complaint which might give rise to such a relationship, nor does the Confidentiality Agreement indicate any placement of Walker/Matraco's trust in Lafarge and Lafarge's concomitant

---

[2] In light of the conclusion that no enforceable contract existed, the court need not concern itself with the application of the statute of frauds, § 725.01, Fla. Stat. (2007), which Lafarge urges an alternative basis for entry of summary judgment in its favor on the breach of oral contract claim and alternative equitable causes of action. "[B]efore it becomes proper or necessary to determine whether the facts permit the enforcement of a... a contract, as an exception under the Statute of Frauds, it must first be determined that the existence of the contract and the terms thereof have been established with both the quantum and the quality of evidence required under the applicable rules of law." *Gable v Miller*, 104 So.2d 358, 360 (Fla. 1958). Because the court concludes that no contract was formed, it is not necessary to determine if the statute of frauds would preclude its enforcement. *Bankers Trust Co. v. Basciano*, 960 So.2d 773, 780 n. 3 (Fla. 5th DCA 2007).

acceptance of that trust. The defendants' counterclaim for breach of alleged fiduciary duty accordingly fails a matter of law. *Taylor Woodrow Homer Florida Inc. v. 4/46-A Corp.*, 850 So.2d 536 (Fla. 5th DCA 2003); *Watkins v. NCNB Nat'l Bank of Fla., N.A.*, 622 So.2d 1063, 1065 (Fla. 3d DCA 1993).

Similarly, without an enforceable agreement, there was no implied duty of good faith and fair dealing between the parties. *Johnson Enterprises of Jacksonville, Inc. v FPL Group Inc*. 162 F.3d 1290, 1314 (11th Cir. 1998); *Cibran Enterprises Inc v BP Products North America,* 365 F. Supp 2d 1241 (S.D. Fla. 2005)(no independent cause of action exists under Florida law for breach of implied covenant of good faith and fair dealing). Accordingly, the defendants' counterclaims for breach of implied duty of good faith and fair dealing (Count 3) and breach of fiduciary duty (Count 4) fail as a matter of law. *See Basciano, supra; Conner, I, Inc. v Walt Disney Co.*, 827 So.2d 318 (Fla. 5th DCA 2002).

### C. Fraud Claim

With respect to the fraudulent misrepresentation claim (Count 5), the defendants were required to plead and prove that they justifiably or reasonably relied on the alleged misrepresentations concerning Lafarge's intent to enter the contemplated joint venture. *Johnson v Davis*, 480 So.2d 625, 627 (Fla. 1985). One is not justified in relying upon some action which the other party is not required to perform. *Bruce v Am. Dev. Corp.*, 408 So.2d 857, 858 (Fla. 3d DCA 1982).

In this case, Lafarge was under no obligation to close the deal simply because it expressed an interest in pursuing the venture with Walker/Matraco. Because Lafarge was under no duty to perform, Walker had no right to rely on the alleged misrepresentations and promises to enter the

contemplated joint venture partnership. Moreover, it is patently unreasonable for Walker/Matraco to rely on such alleged promises where the parties signed a Letter of Intent containing a merger clause that specifically excludes consideration and defeats the force of any oral representations, while simultaneously making clear that any amendments must be in writing signed by both parties. With this predicate, any reliance on the part of Walker/Matraco is unreasonable as a matter of law, and the defendants' fraudulent misrepresentation counterclaim necessarily fails. *Johnson Enterprises of Jacksonville, Inc. v FPL Group Inc*. 162 F.3d 1290, 1314 (11th Cir. 1998); *Bankers Trust Co. v Basciano*, 960 So.2d 773 (Fla. 5th DCA 2007).

### D. Equitable Claims

Finally, Walker/Matraco's alternative equitable claims based on promissory estoppel (Count 9); unjust enrichment (Count 10) and quantum meruit (Count 11) claims fail as a matter of law because they likewise cannot be reconciled with the plain language of the merger clause found at ¶ 4 of the Letter of Intent:

> 4. *Entirety.* This letter, together with the Confidentiality Agreement, constitutes the entire understanding and agreement between the parties hereto and their affiliates with respect to its subject matter and supersedes all prior or contemporaneous agreements, representations, warranties and understandings of such parties (whether oral or written). No promise, inducement, representation or agreement, other than as expressly set forth herein has been made to or by the parties hereto. This letter and the exhibits attached hereto may be amended only by written agreement, signed by the parties to be bound by the amendment. Parol evidence and extrinsic evidence shall be inadmissible to show agreement by and between such parties to any term or condition contrary to, or in addition to, the terms and conditions contained in this letter and the exhibits.

Defendants' equitable claims, all of which are premised upon implied contractual undertakings, are defeated by the express agreement of the parties setting forth these limitations on

their relationship and requiring that any alternation in that relationship be accomplished "only by written agreement, signed by the parties to be bound by the amendment." *See Lynkus Communications Inc v WebMed Corporation, supra.* In the face of this language, any reliance on alleged extra-contractual promises or expressions of intent to consummate the joint venture made by Lafarge is unreasonable as a matter of law. *Cf. Doll, supra* (reliance on oral promise unreasonable as matter of law in light of parties' expression of intent not to be bound without written agreement).

### E.  Confidentiality/Trade Secret Claims

As to defendants' remaining counterclaims for breach of the Confidentiality Agreement (Count 1), violation of the Florida Trade Secrets Act, (Count 6) and conversion of confidential information/property (Count 7), the courts finds summary judgment precluded by the existence of disputed issues of material fact as to whether the information at issue qualifies as protected "trade secrets" or "confidential information." Similarly, with respect to the tortious interference with contract claim (Count 12), the court finds material issues of fact pertaining to the existence of a valid "exclusivity agreement" which preclude summary judgment.

### III. Conclusion

In accordance with the foregoing, it is **ORDERED AND ADJUDGED**:

1. The plaintiff's motion for summary judgment on the defendants' counterclaims for breach of Confidentiality Agreement (Count 1), violation of the Florida Trade Secrets Act (Count 6), conversion (Count 7) and tortious interference with contract (Count 8) is **DENIED.**

2. The plaintiff's motion for summary judgment on the defendants' counterclaims for breach of oral contract-joint venture agreement (Count 2), breach of covenant of good faith and fair dealing

(Count 3), breach of fiduciary duty (Count 4), fraudulent misrepresentation (Count 5), promissory estoppel (Count 9), unjust enrichment (Count 10), quantum meruit (Count 11) and declaratory judgment (Count 13) is **GRANTED.**

3. The plaintiff's motion for partial summary judgment on those corresponding affirmative defenses hinging on the existence of a binding joint venture agreement (affirmative defenses numbered 4, 9, 10) is also **GRANTED.**

4. Pursuant to Fed. R. Civ. P. 58, partial summary judgment in favor of the plaintiff and against the defendants shall enter upon these counterclaims and affirmative defenses by separate order in accordance with the foregoing ruling of the court.

**DONE AND ORDERED** in Chambers at West Palm Beach, Florida this 30th day of May, 2008.

Daniel T. K. Hurley
United States District Judge

cc. All counsel